FILED

2005 Jul-08  PM 02:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

RAY EDWARDS,                           }
                                       }
          Plaintiff,                   }
                                       }
v.                                     }          Case No.: CV 03-P-2522-NE
                                       }
CITY OF MADISON, ALABAMA, et           }
al.,                                   }
                                       }
          Defendants.                  }

## MEMORANDUM OPINION

The court has before it Defendants' Motion for Summary Judgment (Doc. # 85) and Defendants' Motion to Strike (Doc. # 84). The above-referenced motions have been fully briefed and were under submission as of December 9, 2004. (Docs. # 26, 81).

Plaintiff Ray Edwards, who is African-American, asserts claims under Title VII, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1983; and Alabama state law arising from his employment as a City of Madison police officer against the City of Madison, Alabama (the "City"); Daniel Busken, the Police Chief of the Madison Police ("Busken"); Lee Weaver, a Major of the Madison Police ("Weaver"); and Jan Wells, the Mayor of the City ("Wells").

For the reasons outlined below, Defendants' Motion for Summary Judgment is due to be granted as it relates to Plaintiff's Title VII and § 1983 claims because there are no disputed issues of material fact and Defendants have demonstrated that they are entitled to judgment as a matter of law. As to the remaining state law claims, the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) and therefore remands those claims for further consideration by the

state court. Defendants' Motion to Strike will be denied.[1]

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.

---

[1] The court has reviewed Defendants' motion to strike and will assume, without deciding, for the purposes of summary judgment only, that it is due to be denied and that the evidence sought to be stricken is properly considered by the court in its summary judgment analysis. As the court is granting summary judgment in favor of the Defendants on the federal claims, it finds that, even considering the evidence sought to be stricken, Plaintiff has not met his burden to refute the Defendants' motion for summary judgment as that motion relates to the federal claims in this case.

1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of establishing

a *prima facie* case of discrimination. Second, once the plaintiff establishes a *prima facie* case, the

burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for

---

[2] Here, Plaintiff has presented only circumstantial evidence of discrimination. Although Plaintiff contends that he was subjected to offensive comments related to his race and the filing of his EEOC charge, none of the comments rise to the level of direct evidence. First, Plaintiff points to a comment by Weaver that Plaintiff does not "sound black." This alleged isolated comment, made at some time prior to the decisions in this case and without any nexus to the relevant issues, is not direct evidence. *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998). Moreover, Wells' announcement, at a meeting attended by Plaintiff and a number of other police department employees, that those who file EEOC complaints are hurtful to the City is not direct evidence. Plaintiff has failed to allege, much less provide any evidence in support of, a link between this general statement and any adverse action taken against him by Wells or any other City employee. "[R]emarks . . . unrelated to the decisionmaking process itself are not direct evidence of discrimination." *A.B.E.L.*, 161 F.3d at 1330. Moreover, evidence that is subject to more than one interpretation, *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir.1996), or "devoid of any meaningful context," *A.B.E.L.*, 161 F.3d at 1329, cannot constitute direct evidence. Plaintiff also claims that the following incidents – all of which are unrelated to his employment at the City or his allegations in this case – constitute direct evidence: (1) the City's use of "C" for "colored" in its arrest book, (2) Weaver's comment about an African-American applicant that she did not want "their kind" working at the City, and (3) Busken's mutual joke with an African-American officer that his nickname was "Dark Chocolate." These are not direct evidence because they bear no relation to Plaintiff or the decisions at issue in this case. *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1394 (11th Cir. 1997). Moreover, the record is clear that the term "Dark Chocolate" was actually coined by the African-American officer to whom Busken addressed the nickname (Jordan Dep., at 45-48), and Busken only used the term as a mutual joke with that officer. (Jordan Dep., at 48; Busken Dep., at 278-279). Likewise, for as long as anyone can remember, the City's arrest book used "W" for "white" and "C" for "colored" to indicate the race of an arrestee. (Edwards Dep., at 189-192). Once it was called to the City's attention that some officers found the form to be offensive, the City immediately changed the form to "B" for "black." (Affidavits of Busken and Weaver). The Eleventh Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate" constitute direct evidence." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Contrary to Plaintiff's assertions, this is not a direct evidence case.

3

its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 801-02; *Burdine*, 450 U.S. at 251-54.

## II. Relevant Undisputed Facts[3]

### A. Edwards' Employment History

On March 18, 1996, the City of Madison hired Ray Edwards, an African-American male, as a Police Officer. (Affidavit of Weaver). On April 7, 1997, Edwards was assigned to the newly established Vice/Narcotics unit and was placed under the supervision of then Lieutenant Lee Weaver. (Affidavit of Weaver; Dep. of Edwards, at 61-62; Edwards Dep. Ex. 4). During the course of Edwards' career, Weaver consistently recommended Edwards for promotions, gave him high reviews, and ensured that he received specialized training to better perform his investigative duties. (Affidavit of Weaver). Based on Weaver's recommendations, Edwards was promoted to Investigator in February 1998 and then to Detective Sergeant in November 1999. (Affidavit of Weaver; Dep. of Edwards, at 138, Exs. 19, 24).

In December 1999, Busken was hired as the Chief of Police. (Affidavit of Weaver). Following Busken's hire, Edwards was given two grade increases in his position as Detective Sergeant. (Affidavit of Weaver). In May 2001, the City changed the "Detective Sergeant" title to

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

4

that of "Investigator," and increased the pay of all investigators. (Affidavit of Busken; Dep. of Tim Albright, at 11-12; Dep. of Edwards, at 239-240, 242).

In October 2002, Edwards was demoted from his position as an Investigator to the Patrol Officer position. (Affidavit of Busken).

## B. Background Regarding the Creation of STAC

In July 2002, the City entered into a written agreement with the District Attorney's Office, the Sheriff's Department, and the Huntsville Police Department to establish a multi-jurisdictional agency to combat drug problems and associated crime in the area. (Affidavit of Busken; Affidavit of Sgt. Winn, Ex. A; Wells Dep., at 55).[4] The agency, referred to as the Huntsville-Madison County Strategic Counterdrug Team or "STAC," was to be overseen by an Executive Board made up of the four local law enforcement leaders and led by the Commander and project director, Sergeant Jim Winn of the Huntsville Police Department. (Affidavit of Busken; Affidavit of Sgt. Winn).

Pursuant to the agency's agreement, the City agreed to provide two full-time officers to serve on the STAC. (Affidavit of Busken; Affidavit of Sgt. Winn). Based on the nature of the STAC's mission, the City officers who would be assigned to the team would be those investigators who were already performing Vice/Narcotics duties: Plaintiff and John Stringer. (Affidavit of Busken; Affidavit of Sgt. Winn; Dep. of Busken, at 61). The investigators assigned to STAC were to report directly to the STAC office in Huntsville, with Winn directing their activities, approving any overtime, and evaluating performance. (Affidavit of Sgt. Winn).

_____

[4] Until 2002, local law enforcement agencies in Madison County operated their own units to deal with vice activity, drug activity and associated crime. (Affidavit of Weaver; Affidavit of Sgt. Winn).

5

## C. Edwards' Involvement with a Pornographic Website

On July 15, 2002, Sergeant Winn called Weaver and told her that he had received information that Edwards was operating a pornographic website called the "Black Widow." (Affidavit of Sgt. Winn; Affidavit of Weaver; Weaver Dep., at 14-18). Winn told Weaver that he had heard from a confidential informant that Edwards had designed and continued to be involved with that adult pornographic website which displayed nude females posed in sexually explicit positions, and that Edwards was being paid for this. (Affidavit of Sgt. Winn; Affidavit of Weaver; Dep. of Weaver, at 15).[5] The information Winn received was that Edwards also took some of the photographs which appeared on the website. (Affidavit of Sgt. Winn; Dep. of Weaver, at 20-21).[6]

Winn investigated the information and found a website entitled "Black Widow and Friends" that included the name "Cash Rainbow"– a nickname he associated with Edwards because of the number of years they had worked together in joint investigations. (Affidavit of Sgt. Winn, Ex. B, "Black Widow and Friends" website pages). As a Vice/Narcotics Investigator, Edwards was responsible for investigating gambling, prostitution and video stores that sold or rented illegal x-rated videos. (Dep. of Edwards, at 79-80).

Winn explained to Weaver that he was greatly concerned about Edwards' reported behavior because, if it was true, his association with the website could make him an unacceptable candidate

---

[5] Plaintiff attempts to dispute this fact with his testimony. Although Plaintiff may dispute the accuracy of Winn's information, he has no personal knowledge of the conversation between Winn and Weaver and thus cannot dispute what Winn and Weaver discussed.

[6] Plaintiff attempts to dispute this fact with his testimony. Although Plaintiff may dispute the accuracy of Winn's information, he has no personal knowledge of the conversation between Winn and Weaver and thus cannot dispute what Winn and Weaver discussed.

for assignment to the STAC for numerous reasons. (Affidavit of Sgt. Winn; Affidavit of Weaver).[7] The site showed nude photographs of women in sexually explicit positions and contained links to other sites, which, in Winn's opinion, contained pornographic images. (Affidavit of Sgt. Winn; Dep. of Edwards p. 13).[8] Because the investigation of child pornography is linked to adult pornography, Winn believed that Edwards' assignment in the STAC could compromise the integrity of any investigations into pornographic activity. (Affidavit of Sgt. Winn; Dep. of Weaver, at 19). Beyond this conflict, Winn also had great concerns about Edwards' assignment to the STAC because the behavior of officers assigned to the STAC had to be above reproach in order to ensure credibility in dealing with investigations and subsequent testimony in court. (Affidavit of Sgt. Winn).[9] Winn told Weaver about his concerns related to credibility and the relationship between adult porn sites, and the STAC's investigations into child pornography. (Affidavit of Sgt. Winn; Affidavit of Weaver).[10]

Following her conversation with Winn, Weaver spoke to Chief Busken, who initially suspected that the allegation was unfounded and the result of competition and jealousy. (Affidavit of Busken; Affidavit of Weaver). At that time, neither Weaver nor Busken contemplated that

---

[7] Plaintiff attempts to dispute this fact with his testimony. Although Plaintiff may dispute the accuracy of Winn's information, he has no personal knowledge of the conversation between Winn and Weaver and thus cannot dispute what Winn and Weaver discussed.

[8] Plaintiff attempts to dispute this fact with his testimony. Although Plaintiff may dispute Winn's conclusion that the images were pornographic, he cannot dispute that Winn came to this conclusion.

[9] Plaintiff attempts to dispute this fact with his testimony. Plaintiff has no personal knowledge of Winn's concerns and thus cannot dispute Winn's testimony regarding the same.

[10] Plaintiff attempts to dispute this fact with his testimony. Although Plaintiff may contend that Winn should not have been concerned about his actions, he has no personal knowledge of the conversation between Winn and Weaver and thus cannot dispute what Winn and Weaver discussed.

7

Edwards would be demoted or terminated, as they believed the allegations would turn out to be unfounded; thus, the situation was handled as an informal inquiry. (Affidavit of Busken; Affidavit of Weaver; Dep. of Weaver, at 16-17,36; Dep. of Busken, at 136, 147).[11] Weaver attempted to personally verify that the website existed before talking to Edwards, but was unable to do so. (Affidavit of Weaver).

## D. Weaver's Discussion With Edwards' About the Website

On July 23, 2002, Weaver was working late when Edwards called to say that he would be coming by the department. (Affidavit of Weaver). Weaver and Edwards smoked a cigarette together outside, and then Weaver told Edwards that she needed to talk to him about something. (Affidavit of Weaver). During the course of their conversation, Edwards admitted to Weaver that he had designed an adult website in 1997-1998. (Affidavit of Weaver; Dep. of Edwards, at 12-13, 74). Weaver recalls that Edwards said that he had taken some of the nude photographs himself. (Affidavit of Weaver; Dep. of Weaver, at 54). While Edwards now admits that he has taken pictures of nude women, he denies that he took any of the particular photos appearing on the Black Widow site. (Dep. of Edwards, at 40-57, 74). In addition to designing the site, Edwards also updated the site with additional pictures. (Dep. of Edwards, at 28-29). Weaver told Edwards that she was going to write him up. (Dep. of Edwards, at 263).

Weaver asked Busken if she should conduct a formal investigation, but Busken did not believe that was necessary since Edwards had admitted to his involvement with the website, and at that time, they still did not contemplate that Edwards would be demoted or terminated, only warned.

---

[11] Although Plaintiff disputes this fact, he does so only with a general reference (no page number) to Weaver's deposition and by citing Exhibit 6 of Busken's deposition. Neither source appears to dispute the testimony of Busken and Weaver cited in support of this fact.

8

(Affidavit of Busken; Affidavit of Weaver; Dep. of Weaver, at 64).[12]

On July 26, 2002, Weaver prepared a memorandum to Chief Busken, at his direction, outlining the information relayed to her by Sergeant Winn, her discussion with Edwards, and Edwards' employment status. (Affidavit of Weaver; Edwards Dep. Ex. 8; Weaver Dep., at 39-40, 44-46). Weaver's memorandum stated that she believed Edwards had violated City Policy 9.6.21 (Conduct Unbecoming an Employee), Police Department General Order 3.07 (Code of Ethics) and that Edwards had violated her instructions for processing evidence with regard to an incident unrelated to the website. (Affidavit of Weaver; Edwards Dep., Ex. 8). Weaver included the following in her memorandum:

> While taking into consideration Inv. Edwards' unblemished past service in this unit as our Vice/Narcotics Investigator, I am still concerned with his lack of good judgment and feel he needs to be removed from his current assignment. His credibility as an investigator is questionable and Sgt. Winn will recommend to the Task Force Board that Inv. Edwards not be assigned to the new unit.

(Edwards Dep., Ex. 8). Busken decided to discipline Edwards with a written warning, the lowest level of discipline provided for in the City's policies and procedures. (Affidavit of Busken).[13]

## E.   Action Following Edwards' Admission Of Involvement With Website

On July 30, 2002, Busken met with Edwards to give him notice that he intended to issue a written warning ("Notice of Proposed Disciplinary Action") for "Conduct Unbecoming an

---

[12] Although Plaintiff disputes this fact, he does so only with a general reference (no page number) to Weaver's deposition and by citing Exhibit 8 of Edwards' deposition. Neither source appears to dispute the testimony of Busken and Weaver cited in support of this fact.

[13] Although Plaintiff disputes this fact, he does so only by citing Exhibit 2 of Wells' deposition, which does not appear to dispute the testimony of Busken cited in support of this fact.

9

Employee," violation of the Code of Ethics, and violation of the Secondary Employment policy. (Affidavit of Busken; Edwards Dep., Ex. 9; Dep. of Edwards, at 84-85).[14] Busken told Edwards he could respond to the Notice in any of three ways: he could ask for an informal pre-discipline hearing with Busken to defend the allegations, he could prepare a written response to the allegations, or he could take no action at all. (Affidavit of Busken). Busken represented to Edwards that if he accepted the punishment of a written warning for the conduct charged, that would be the "end of the matter." (Dep. of Edwards at 116-17, 269-70). Edwards told Busken he wanted a pre-discipline hearing, and the informal hearing was set for August 1, 2002. (Affidavit of Busken).

On August 1, 2002, Edwards again met with Busken to present his response to the written warning. (Affidavit of Busken).[15] When talking to Busken, Edwards admitted that he had taken photographs of women for websites, but denied that he had taken any of the nude photographs for the particular website in question. (Affidavit of Busken; Dep. of Edwards, at 86).

On August 9, 2002, Busken presented Edwards with a Notice of Disciplinary Action in the form of a written warning for Conduct Unbecoming an Employee, violations of the Code of Ethics, and violation of the Secondary Employment Policy. (Affidavit of Busken; Edwards Dep., Ex. 10).

## F.   Voluntary Demotion Memorandum

After speaking with Winn, it became obvious to Busken that it would not be a good idea to recommend Edwards for the assignment to the STAC team, as Winn made it clear that he would recommend to the Executive Board that Edwards not be assigned to the STAC unit. (Dep. of

---

[14] Although the notice also initially included a proposed violation regarding "Securing Physical Evidence," that violation was not sustained. (Affidavit of Busken).

[15] Although Plaintiff cites to his affidavit to dispute this fact, his affidavit contains no evidence that disputes this statement.

Busken, at 57-60). Accordingly, Edwards and Busken discussed the possibility of a voluntary demotion by Edwards. (Edwards Affidavit). Busken offered to write a letter to include in Edwards' file saying that he did not necessarily consider the action to be a demotion, so that it would look better to future supervisors. (Dep. of Edwards, at 95).

On August 22, 2002, Edwards prepared a memorandum entitled "Voluntary Demotion" which was sent to Chief Busken. (Dep. of Edwards, at 93-94; Affidavit of Busken; Edwards Dep., Ex. 13). Although the subject line of the memorandum reads "Voluntary Demotion," the language of the memorandum made Weaver and Busken question whether it was actually voluntary, or whether Edwards disagreed with the process. (Affidavit of Weaver; Affidavit of Busken; Dep. of Busken, at 99-100; Edwards Dep., Ex. 13).

After reviewing Edwards' memorandum, the City's Human Resources Director and the City Attorney advised Busken that he would have to pursue demotion by other means because Edwards' memo did not appear to be voluntary. (Affidavit of Busken; Dep. of Busken, at 100-08).[16]

## G. Proposed Disciplinary Action – Demotion – and Disciplinary Hearing

On September 3, 2002, Busken gave Edwards a second Notice of Proposed Disciplinary Action which included essentially the same charges as the first disciplinary action with the added charge of falsification (Dep. of Busken at 102-08; Dep. of Edwards at; Affidavit of Edwards; Dep. of Wells at127-28; Busken Dep., Ex. 11). Busken told Edwards that this action was being pursued because the City did not believe Edwards' memorandum of August 22, 2002 to be voluntary. (Dep. of Edwards, at 106-07, 117-18). Edwards did not offer to write another voluntary demotion letter

---

[16] There is no appeal available from a voluntary demotion, thus, if Edwards' letter had been accepted, he would not have been able to appeal his voluntary demotion. (Dep. of Busken, at 101-02).

11

with language that sounded more voluntary. (Affidavit of Busken).

Busken previously had not initiated two separate disciplinary actions arising out of the same conduct against any white employees. (Dep. of Busken at 141-42). However, Busken maintains that he only used the disciplinary process to seek Edwards' demotion from his position as investigator because the City could not accept Edwards' "voluntary" demotion. (Dep. of Busken at 101-02).

This second Notice of Proposed Discipline for Demotion stated that Edwards' investigator position would no longer exist because of the transition of that position to STAC, referenced Weaver's concern with Edwards' lack of judgment, and added a charge of falsification. (Dep. of Busken, at 106-08; Busken Dep. Ex. 11). Edwards was advised of his right to request a hearing before a hearing officer and was advised that he would be reduced to Grade 9, Step 5 (from Grade 10, Step 5) effective September 16, 2002. (Affidavit of Busken). On September 5, 2002, Edwards submitted a written request to appeal the decision to demote him. (Edwards Dep., Ex. 15).

Edwards' disciplinary hearing was conducted on September 18, 2002, during which testimony was given by Chief Busken, Weaver, Officer Mark Bray and Edwards. (Affidavit of Busken). Following the hearing, the hearing officer issued Findings of Fact and a Ruling on September 27, 2002. (Busken Dep., Ex. 6)

> Because the evidence in this matter was obtained in violation of the City of Madison Police Department Policies and Procedures Manual and the Police Bill of Rights Act, it cannot be considered. Without this evidence, the charge of violation of Section 9.6.4 - Falsification cannot be sustained. Further, the charges of violations of Section 9.6.21 - Conduct Unbecoming an officer, and Policy 93-14 - Secondary Employment cannot be sustained without first following proper procedure and must be reintroduced before any disciplinary action can be taken under those charges. **Therefore, the decision to demote Investigator Edwards must be overturned. However, since the job Investigator Edwards previously held with the City**

12

> **of Madison Police Department was abolished, Investigator
> Edwards must remain as a Patrol Officer.**

(Busken Dep., Ex. 6) (emphasis added).[17]

Because the ruling caused some confusion with city officials, the hearing officer was asked

to provide clarification. (Dep. of Busken, at 127-28). On October 3, 2002, the hearing officer issued

the following Addendum to Findings of Fact:

> The Findings of Fact dated September 27, 2002 is affirmed with the
> following addendum to the end of the findings: **The job Investigator
> Edwards previously held with the City of Madison Police
> Department as a Narcotic-Vice Agent was transferred to the
> Madison County Drug Task Force Unit. Therefore, the Hearings
> Officer finds that his job was effectively abolished due to the fact
> that the supervision of this job is with the Madison County Drug
> Task Force Unit and not with the City of Madison Police
> Department.** Under Section 7.1 of the Policy and Procedures
> Manual, **an employee may be demoted if his position is abolished**.
> Due to this, Investigator Edwards was transferred/demoted to a job
> with a lower pay grade. Under Section 12.1.1 of the City of Madison
> Policies and Procedures Manual, Officer Edwards' pay will be
> established at the grade of the new position at the same step he was
> prior to the transfer. Therefore, Officer Edwards will be compensated
> at the grade level of a patrol officer with the same step he had attained
> as an Investigator.

(Busken Dep., Ex. 5) (emphasis added). Although the Hearing Officer overturned the proposed

disciplinary action of demotion, Edwards could not remain in the position of Vice/Narcotics

Investigator because that position was being transferred to the STAC and the STAC commander

would not recommend him. (Affidavit of Busken). Accordingly, the City decided it either must

---

[17] The hearing officer also found, "Director Weaver's report dated July 26, 2002, clearly was written in an effort to substantiate the charge of conduct unbecoming an employee and for violation of secondary employment under the rules and regulations of the City of Madison Police Department this report forms the basis of Chief Busken's decision to demote Investigator Edwards. Because the report written by Director Weaver was placed in Investigator Edwards' file without his reading or signing it, the report should be removed from his personnel file." (Busken Dep., Ex. 6).

13

terminate Edwards or demote him. (Affidavit of Busken).[18]

On October 8, 2002, Edwards received written notification from Busken, with the written approval of Mayor Wells, that he was being demoted to the position of patrol officer, effective October 28, 2002. (Affidavit of Busken; Edwards Dep., Ex. 17).[19] The City considered this to be an "administrative" demotion (Affidavit of Busken; Dep. of Towery, at 79-80), so no notice of appeal was given to Edwards after he was informed of the City's decision to demote him. (Dep. of Wells, at 82). Following receipt of this notification, Edwards could have, but did not, submit a grievance as provided for by City of Madison Policies, Section 10, dated September 9, 2002. (Affidavit of Busken).

Busken has sought to demote two white officers since he has been Chief of Police, Danny Moore and Lanny Perry. (Dep. of Busken, at 29-33). Moore was demoted for conduct unbecoming an officer; however, Perry's intended demotion was overturned by the City Council on appeal and his punishment was changed to a three-week suspension. (Dep. of Busken, at 30-34; Dep. of Edwards, at 214-15).

## H. Special Response Team

The Madison Police Department has a Special Response Team which is similar to a SWAT team (hereinafter "SRT/SWAT"). (Affidavit of Busken; Affidavit of Weaver; Dep. of Edwards, at

---

[18] Moving someone from a higher grade to a lower grade, whether voluntary or otherwise, is a "demotion" under City guidelines, rather than a transfer. (Dep. of Busken, at 92; Dep. of Towery, at 216).

[19] At the time of Edwards' demotion, there were six other investigator positions (excluding the two Vice/Narcotics positions), which were all filled by other officers. (Affidavit of Weaver; Affidavit of Busken; Dep. of Edwards, at 225-26). Busken testified that he had inquired among other investigators as to whether they would be transferred to the Vice/Narcotics assignment so that Edwards could be transferred to another assignment, but none did. (Dep. of Busken at 206-07).

14

130). The Commander of the SRT/SWAT is Weaver. (Affidavit of Weaver). The SRT/SWAT is comprised of volunteer officers who serve on the team at the pleasure of the police chief and who are not compensated for their participation. (Affidavit of Busken; Affidavit of Weaver). SRT/SWAT members participate in extra training and have additional demands placed on their free time because they are subject to short notice call-outs to hostage situations, barricaded situations, sniper situations, and apprehension of armed suspects. (Affidavit of Busken; Affidavit of Weaver; Dep. of Edwards, at 247).

Edwards joined the SRT/SWAT team in August 2000. (Affidavit of Weaver). Following the disciplinary hearing regarding Edwards' demotion, the SRT/SWAT team leader recommended to Weaver that Edwards be removed from the team because he and the other members of the team had concerns about Edwards' judgment and ability to function as part of a unit which relies on a heightened level of cohesion for safety and survival. (Affidavit of Weaver). Weaver approached Busken about Edwards' status on the team and expressed concern regarding Edwards' continued presence on the team because of his involvement with the adult website. (Affidavit of Busken; Affidavit of Weaver).

On November 18, 2002, Weaver prepared a memorandum to Busken recommending that Edwards be removed from the team (Affidavit of Busken; Affidavit of Weaver), and, as a result, Edwards was removed from his position on the team for "bad judgment." (Dep. of Busken p.194-95; Weaver Dep. Ex. 22). Edwards did not receive a loss in pay as a result of his removal from the SRT/SWAT. (Dep. of Edwards, at 247). Edwards did not submit a grievance about his removal from the team. (Affidavit of Busken; Affidavit of Weaver).

15

## I.    Light Duty Restrictions

It is a common practice at the City for officers who are temporarily unable to perform their normal duties to be placed on "light duty" status. (Affidavit of Weaver; Affidavit of Busken). While the Madison Police Department has adopted a policy entitled "Alternate Duty," the department does not have, and has never had, an explicit written policy which addresses light duty restrictions regarding use of marked vehicles, wearing the standard police uniform, wearing the police department badge, and carrying of a weapon. (Affidavit of Busken; Affidavit of Weaver). Decisions regarding restrictions placed on officers with regard to what they wear or carry while on light duty have routinely been left to the individual officer's supervisor, taking into consideration the location where the light duty will be performed, the officer's potential level of interaction with the general public, and the nature of the officer's injuries. (Affidavit of Busken; Affidavit of Weaver; Dep. of Weaver, at 257-58). It is common practice that officers on light duty status do not operate marked patrol vehicles because this would lead members of the general public to believe the officer is fully prepared to perform all ordinary law enforcement duties in the event of an emergency. (Affidavit of Busken; Affidavit of Weaver; Dep. of Weaver, at 257-58).[20]

From the time that Edwards began working as a Vice/Narcotics Investigator in April 1997, he started wearing plain clothes and driving an unmarked vehicle. (Affidavit of Weaver). In August 2002, after Edwards ruptured the Achilles tendon in his left ankle as part of his training with the SRT/SWAT team, Edwards' doctor placed him on modified duty – performing only a sedentary desk job. (Edwards Dep., Ex. 52). When Edwards returned to duty, he went to his ordinary place

_____

[20] As an alternative, officers routinely operate their own personal vehicles or are assigned unmarked vehicles owned by the City. (Affidavit of Busken; Affidavit of Weaver).

16

of business which was an office in Madison, separate from the City complex on Hughes Road. (Affidavit of Weaver). Edwards was on crutches and wore a blue neoprene-type support boot with velcro closures to his mid-calf. (Affidavit of Weaver). After Edwards had been back at work for a few days, Weaver attempted to contact him at his office and was unable to do so because he was not performing desk work as directed by Dr. Greco. (Affidavit of Weaver).

When Weaver located Edwards, they had a discussion regarding his schedule, the type of work he was to perform, and his light duty restrictions. (Affidavit of Weaver; Dep. of Edwards, at 132). Weaver told Edwards that because he was on desk duty, he was not to be driving around performing ordinary investigative work. (Affidavit of Weaver). Weaver explained that as long as Edwards wore his weapon and carried a badge, public citizens who observed him would assume that he was fully prepared to perform as a law enforcement officer, which he was not. (Affidavit of Weaver).

Edwards asked Weaver if he could keep his weapon in his vehicle while driving to and from work and Weaver and Busken told him that he could. (Affidavit of Weaver; Dep. of Edwards, at 132). Edwards informed Weaver that he had had threats against his life and wanted to protect himself; to ensure Edwards' safety, he was allowed to carry his weapon in his vehicle while traveling to and from the police department, and Chief Busken decided that he was also to be escorted to and from his court appearances. (Affidavit of Weaver; Affidavit of Busken).

Weaver also supervised other officers on light duty. Mark Bray had a shoulder injury to his non-firing arm and was on desk duty for approximately four weeks. (Affidavit of Weaver; Dep. of Weaver, at 217). Because he had been restricted from carrying his weapon, Bray was also escorted to and from court appearances by another officer for his safety. (Affidavit of Weaver). Bray did

17

wear his weapon and carry his badge for a short time until he was observed by Weaver, who instructed him to cease such conduct until his light duty period ended. (Affidavit of Weaver; Dep. of Edwards, at 134, 136; Dep. of Bray, at 40-41). A white officer, Kamus, wore his uniform while Weaver was a supervisor and while Kamus was on light duty. (Dep. of Edwards, at 135). When Officer Kamus was on light duty, Weaver ordered him not to carry his weapon and badge. (Dep. of Weaver, at 216).[21]

Weaver herself was on light duty for approximately three months in 2002 as a result of a shoulder injury. (Affidavit of Weaver). She did not carry a weapon or wear a badge. (Affidavit of Weaver).

## J.    Edwards' Performance Reviews

In March 1999 and March 2001, Weaver rated Edwards' performance as "outstanding." (Dep. of Edwards, at 286; Edwards Dep., Ex. 42, 43). On April 12, 2002 and November 10, 2003, Weaver completed performance reviews, which were approved by Busken, that rated Edwards as "exceeds requirements." (Dep. of Edwards, at 284-85, 287-88; Edwards Dep., Ex. 41, 45).

Edwards claims that Chief Busken discriminated against him by changing his 2002-2003 evaluation from a rating of 4 to a rating of 2 in the area of "judgment." (Dep. of Busken, at 235;

---

[21] Plaintiff has also presented evidence of other light duty arrangements involving officers who were not supervised by Weaver. John Stout, who worked for then Captain Moore, suffered a shoulder injury to his firing arm, and, by his own choice, Stout did not carry a weapon or wear a badge for approximately two weeks because he wore a sling. (Affidavit of Weaver; Dep. of Weaver, at 255-56). After Stout stopped wearing a sling, he carried his weapon and badge for approximately two months; Weaver observed this and did not order him to not carry his weapon. (Affidavit of Perry). Moore, not Weaver, was Stout's supervisor at the time. (Dep. of Weaver, at 255-57). Officer Tim Rimkus, who also worked for Captain Moore, not Weaver, was allowed to wear his badge while on light duty following carpel tunnel surgery. (Affidavit of Weaver). Officer Clayton Jordan, who also worked for Captain Moore, not Weaver, was allowed to carry his weapon and wear his badge while on light duty. (Affidavit of Weaver).

Dep. of Edwards, at 200-01; Dep. of Busken, at 238). In lowering Edwards' evaluation score, Busken considered Edwards' involvement with the website, conduct which occurred outside of the evaluation period. (Dep. of Busken, at 238).

Edwards filed a grievance with Human Resources regarding the language Chief Busken wrote on his evaluation.  (Dep. of Edwards, at 202; Edwards Dep., Ex. 30).  Terri Towery, the Human Resources Director, investigated Edwards' grievance and sent Edwards a memo indicating that the Chief was willing to change the wording. (Dep. of Edwards, at 202; Edwards Dep., Ex. 31). Once Busken retracted his comments referencing Edwards' disciplinary hearing on his evaluation, the matter was resolved. (Dep. of Edwards at 201; Dep. of Terri Towery, at 38, 183-88; Edwards Dep., Ex. 31).  Ultimately, Edwards received a rating of "above average – exceeds requirements" on his performance review.  (Dep. of Edwards, at 207).

Edwards alleges that by altering and lowering his evaluation, his pay increase was delayed. (Dep. of Edwards; p.202-203; Affidavit of Edwards).[22] Edwards did receive a pay increase, however. (Dep. of Towery, at 188-190).

### K.    Secondary/Outside Employment

From April 1993 until January 2003, the police department had its own policy regarding off-duty or "Secondary" employment. (Affidavit of Busken; Affidavit of Weaver).  The policy defines off-duty employment as "any paid employment performed by an employee in addition to his/her employment with the City of Madison" and states that officers must seek written approval through the chain of command from the police chief to engage in off-duty employment.  (Affidavit of Busken).

---

[22] Defendants dispute that Edwards' pay increase was delayed. (Dep. of Towery, at 188-90).

In late July 2002, Chief Busken received a phone call from the Madison City Schools regarding a need to have officers escort a special needs student. (Affidavit of Busken). On July 31, 2002, Chief Busken posted a notice in the department regarding the off-duty employment, advising interested officers to submit a written request. (Affidavit of Busken). On August 23, 2002, Officer Brian Tapley submitted a Off-Duty Employment Approval Request form for the job, which was forwarded through his chain of command to Chief Busken. (Affidavit of Busken). Busken approved Tapley's request, which was subsequently approved by the mayor. (Affidavit of Busken). On the approval form, Busken advised Tapley that he would need to sign an off-duty work agreement which would be prepared by the City Attorney. (Affidavit of Busken). Tapley signed the off-duty work agreement on August 26, 2002, although he actually began working as a behavioral aide on August 19, 2002. (Affidavit of Busken). Tapley went to work before all of the paperwork was completed because the City Attorney had not yet prepared the off-duty employment agreement at the time of Tapley's request, and the school where he was to work had an urgent need for the services. (Dep. of Busken, at 214-15, 222).

Several months later in November 2002, Edwards requested off-duty employment with the Madison City Schools. (Affidavit of Busken; Dep. of Busken, at 211-23; Busken Dep. Ex. 20). On November 20, 2002, Busken hand-wrote a note on Edwards' memo stating that the off-duty employment agreement must be completed. (Affidavit of Busken; Dep. of Busken, at 211-23; Busken Dep. Ex. 20). The off-duty agreement, which was for purposes of workers' compensation insurance, was attached to Busken's memo. (Affidavit of Busken).

Two months later on January 21, 2003, Edwards submitted the off-duty employment agreement. (Busken Dep. Ex. 20). On January 24, 2003, Chief Busken sent a memorandum to

20

Edwards acknowledging receipt of the agreement, advising Edwards that the school had stated it would not provide him with worker's compensation insurance, and instructing Edwards to complete a MPD Off-Duty Employment Approval Request form (which was attached to the memo) no later than January 29, 2003. (Affidavit of Busken). Edwards' request was subsequently approved by both the Chief and the Mayor. (Affidavit of Busken; Busken Dep. Ex. 21).

## L. Other Investigations Regarding Edwards

Tim Albright, who is a lieutenant over the investigations division, has been involved in two investigations related to Edwards – one involving an alleged "extortion" claim and one involving a laptop. (Dep. of Tim Albright, at 31).

The first investigation arose because during the Winter of 2002, Albright was advised of a letter filed by a citizen who complained that Edwards had taken money from an informant. (Dep. of Albright, at 35-36). Busken had received the letter and brought it to Albright to look into it. (Dep. of Albright, at 35-37). The claim against Edwards was serious in nature and could have led to his demotion or dismissal. (Dep. of Tim Albright, at 38; Dep. of Wells, at 145-46). Upon investigation, Albright found that the claim was baseless, and in essence, Edwards was "exonerated." (Dep. of Albright, at 39). Albright reported to Busken that the claim was unfounded. (Dep. of Albright, at 39).

The second investigation arose after another officer was given a laptop computer previously used by Edwards when he was a Vice/Narcotics Investigator. (Dep. of Edwards, at 64). There was only one laptop computer assigned to that unit, and Edwards used it at work and offsite at home. (Dep. of Edwards, at 64-65). At some point after Edwards' demotion, Officer John Stringer was given custody and control over the laptop. (Affidavit of Weaver).

21

In January 2003, Stringer was using the laptop when he accidently deleted a file. (Dep. of John Stringer, at 16). When Stringer attempted to retrieve his file, he noticed that there were items in the deleted files that were pictures of nude women and a pornographic video clip. (Dep. of John Stringer, at 16-17, 19). Since Stringer knew that Edwards had been involved with an adult website, he became concerned that the existence of these pictures and movie clips on a computer that was now in his possession could get him in trouble. (Dep. of John Stringer, at 17). Stringer immediately took the laptop to Weaver, who secured the computer. (Dep. of Weaver, at 126-127; Dep. of John Stringer, at 17). ).

Weaver informed Busken about the items found on the laptop and Busken instructed Weaver to conduct an investigation. (Dep. of Weaver, at 127). Weaver instructed Stringer to prepare a memorandum regarding what he had found on the computer, which he did. (Dep. of Weaver, at 130; Weaver Dep., Ex. 11).

Shortly thereafter Weaver was promoted to Major and the investigation was transferred to Albright. (Affidavit of Weaver; Dep. of Weaver, at 136-37). Albright forwarded the computer to an outside consultant who was a forensics expert to determine how the material came to be on the computer and the dates it was placed on there. (Dep. of Albright, at 57; Albright Dep., Ex. A). The consultant determined that the files were created on the laptop computer on February 2, 2002 and February 4, 2002, and that the entries for the photos and videos were in Edwards' personal profile. (Dep. of Albright, at 47, 70-71; Albright Dep., Ex. A). Albright concluded that the laptop computer, City property, had been misused. (Dep. of Albright, at 47).[23] No action was ever taken following

___

[23] Plaintiff maintains that his personal profile refers to his password, which anyone who had access to that computer could have discovered (Affidavit of Edwards, at 9).

22

the investigation of the laptop computer. (Affidavit of Busken; Affidavit of Weaver; Dep. of Edwards, at 159).

Busken has authorized numerous investigations or inquiries into alleged misconduct of other police officers with the City of Madison since he has been the Chief of Police. (Dep. of Busken, at 157-173). Albright also has been involved in numerous other investigations of officers. (Dep. of Albright, at 59-62). Edwards was not informed of either of the two investigations conducted by Tim Albright nor was he informed of the results of the two investigations. (Affidavit of Edwards p.7).

### M.    Alleged Comparators

Edwards knows of no other officers who have ever designed or developed an adult website. (Dep. of Edwards, at 215).

Edwards claims that three officers, Mike Allen, Drew Westrope and John Stringer, (all white) have committed adultery, which he believes demonstrates "bad judgment." (Dep. of Edwards, at 180-82).[24] City of Madison police officers who commit adultery are guilty of exercising bad judgment and violate the law of Alabama. (Dep. of Busken at 174-75; Dep. of Wells; Dep. of Weaver at 163, 164). Until Edwards' deposition, Weaver and Busken had not heard allegations that officers Allen, Westrope and Stringer had allegedly committed adultery. (Affidavit of Weaver; Affidavy of Busken; Dep. of Weaver, at 194-96).

Edwards claims that a white officer, Marcus Adams, used bad judgment in stating over a recorded line that he was going to commit suicide. He was not removed from the SRT/SWAT team or otherwise disciplined. (Dep. of Edwards, at 182). Adams was experiencing martial difficulties

---

[24] Stringer maintains that the rumors of his alleged adultery are false. (Dep. of Stringer, at 13-14).

and has been counseled. (Affidavit of Busken). The police department confiscated Adams' weapon after he made the suicidal threat. (Affidavit of Edwards, at 8).

Edwards claims that another white officer, John Russell, used bad judgment when, during an investigation of a prostitution ring, he paid a female suspect for a hand job, which he received to the point of ejaculation. (Dep. of Edwards, at 192-94). Edwards thinks it is discriminatory that Russell was allowed to remain on the SRT/SWAT team. (Dep. of Edwards, at 194-95).

Edwards also complains that Mike Allen, a white SRT/SWAT team leader who was recently promoted to sergeant, fell asleep twice while on duty. (Dep. of Edwards, at 220-21). Until receipt of Edwards' claim, Weaver was unaware of any allegation regarding a member of the SRT/SWAT sleeping on duty. (Dep. of Weaver, at 192-94). Falling asleep on duty is a serious offense. (Dep. of Moore at 71-73; Wells Dep., Ex. 1, section 9, at 5). Upon learning of Allen's incident, Allen was counseled. (Affidavit of Weaver).

Edwards also believes that Officer John Stout (white) demonstrated bad judgment when he sprayed an arrestee in the holding cell with pepper spray when the arrestee spit on him, which caused him concern regarding the possible transfer of diseases. (Dep. of Weaver, at 220-26). Since pepper spray is considered a use of "force," a form was completed with regard to this incident. (Dep. of Weaver, at 221-22). Weaver reviewed the videotape related to Stout's use of the pepper spray and discussed the situation with Stout. (Dep. of Weaver, at 223-26). Weaver discovered that the arrestee had continued spitting on Stout even after Stout asked him numerous times to stop. (Dep. of Weaver, at 226). Weaver did not find any policy violations in this situation (Dep. of Weaver, at 227), and no disciplinary action was ever initiated against Stout for his conduct. (Dep. of Busken at 177-80; Dep. of Weaver at 227).

24

## N.    Relevant Police Policies

The Police Officer Bill of Rights requires that when a law enforcement officer "is under investigation and is subject to interrogation by members of his agency, for substantial reasons that would likely lead to demotion, or dismissal, . . . [the ] law enforcement officer ...shall be informed of the nature of the investigation prior to his interrogation." (Wells Dep. Ex. 13, at 3.16 8a). The Police Department Policies and Procedures Manual provides that whenever a department employee is under an administrative inquiry and investigation and is subject to interview by his department for substantial reasons that would likely lead to demotion or dismissal, such interviews must be conducted a certain way. (Policy Manual, § 3.16.4, Wells Dep. Ex. 13). One such requirement is that the employee under investigation shall be informed of the nature of the investigation prior to the interview and no disciplinary action is to be taken against an employee unless he is informed of the identity of the complaint. (Busken Dep., Ex. 6).

The City of Madison's policies and procedures also requires that "[t]he Department Head, subject to the approval of the Mayor (and review by the human resources director or the City Attorney), will discipline the employee in an appropriate manner consistent with the certified findings of fact of the hearing officer. . if discipline is administered, the department head will notify the employee, in writing, of the discipline to be administered the notice will contain:

> (a) the nature of the action and the effective date;
> (b) the specific grounds for the action taken;
> (c) a description of the appeals right of the employee, (none
> where the employee's right to a hearing was waived);
> (d) the notice should be signed by the department head and by
> the employee."

(Wells Dep., Ex. 1, Section 9, at 14 ). The City of Madison's policies and procedures assign the hearing officer the following duties: "It will be the duty of the hearing officer to determine if the

25

charges asserted against the employee are supported by the evidence and whether any rule or regulation of the City has been violated by the employee charged. A hearing officer will not determine the degree of any discipline which may be warranted." (Wells Dep., Ex. 1 Sec. 9, at 18). Disciplinary demotions that are processed through a disciplinary hearing may only be carried out if supported by factual findings by the disciplinary hearing officer (Wells Dep., Ex. 1, at sec 9).

## O.   Hostile Environment Allegations

### 1.   Racial Slurs

Edwards has never heard Weaver, Busken, or Mayor Wells or anyone in authority with the City of Madison say they were not going to hire or promote African-Americans. (Dep. of Edwards, at 231-232). Weaver did tell Edwards that "[he] didn't sound black," but he never told Weaver that this offended him. (Dep. of Edwards, at 148-49). Edwards testified that he "never said [Weaver] was racist." (Dep. of Edwards; at 188). During the process of hiring an African-American officer, Weaver stated that the City did not want to hire "that kind" of officer because there could be trouble if he was hired. (Dep. of Moore at 23, 24-27).

### 2.   Dark Chocolate

Several years ago, an African-American officer, Clayton Jordan, jokingly referred to himself as an exotic dancer with the stage name of "Dark Chocolate" when he pulled over a car of dancers during a DUI detail. (Dep. of Clayton Jordan, at 45-48). Chief Busken heard about this joke and, since Jordan liked to joke with him, decided he would have some fun with it. (Dep. of Busken, at 278-79). Busken sent a memo to Jordan stating that he had violated department policy regarding engaging in secondary employment without prior approval since he was working as an exotic dancer with the stage name of "Dark Chocolate." (Dep. of Busken, at 279; Dep. of Jordan, at 48). Jordan

26

testified that he was not offended by Busken's memo since he (Jordan) initiated the whole thing. (Dep. of Jordan, at 30).[25] Later Busken referred to Clayton Jordan as "Dark Chocolate" while walking down the hallway in the City's municipal complex. (Dep. of Busken p.280; Dep. of Edwards at 148-52; Dep. of Moore, at 45).

### 3.    Wells' Statement Regarding EEOC Charges

Edwards testified that in a departmental "all-hands" meeting, attended by police officers and civilian personnel, Mayor Wells stated that "those that are filing EEOC complaints are not good for the department." (Dep. of Edwards, at 152-53). Wells admitted that she said EEOC complaints were hurtful and disappointing to the department and to the City. (Dep. of Wells at 155-156). Edwards said this statement embarrassed him because he was the only one in the room that he knew of who had filed an EEOC claim. (Dep. of Edwards, at 153). Wells knew that Edwards was present at the meeting and that he had filed an EEOC complaint. (Dep. of Wells, at 159). Edwards never mentioned to Chief Busken or Mayor Wells that he found the Mayor's statement to be offensive, nor did he tell Mayor Wells that he thought he was being discriminated against by her statement. (Dep. of Edwards, at 155-56).

### 4.    Booking Forms

For as long as anyone can remember, an arrest log in the Madison Police Department booking room used the letter "C" for "colored" arrestees instead of Black/African-American. (Dep. of Edwards, at 189-92; Busken Dep. at 294-95). After Weaver and Busken were made aware that some

---

[25] At first, Jordan thought Busken truly believed he truly was a dancer, and Jordan thought the memo might be serious. (Dep. of Jordan, at 48). Later, Edwards talked to Jordan about it and Jordan told him he considered it a joke. (Dep. of Edwards, at 150-51; Dep. of Jordan, at 32, 48-50).

officers found these references offensive, the forms were changed. (Dep. of Busken, at 293-95; Dep. of Weaver, at 242-43; Dep. of Edwards, at 190).

### 5.   "N" Word

Edwards testified that a City employee in a different department, David Glassman, allegedly used the n-word around another black employee. (Dep. of Edwards, at 178-90). Glassman apologized to the employee who had complained, and Glassman was counseled for making this statement. (Dep. of Towery, at 213-14). Glassman never used that word, or any other offensive words, in front of Edwards. (Dep. of Edwards, at 180).

## III.   Applicable Substantive Law and Discussion

By order dated October 22, 2004, the court required the parties to rebrief their submissions in accordance with the court's standard procedures and to resubmit their summary judgment factual recitations and include only those facts truly material to the dispute. (Doc. # 81). The court determined that rebriefing was appropriate because, among other things, Plaintiff's brief in opposition to summary judgment failed to include any citations to the record to support the evidence referenced. (Doc. # 73).[26] Despite the court's admonitions, Plaintiff's resubmitted brief in opposition to summary judgment *still* fails to include any citations to the record evidence. (Doc. # 87).

Moreover, Plaintiff's resubmitted opposition brief contains little or no analysis of the *prima facie* elements of his claims, leaving the court to sort through which allegations form the basis of

---

[26] The court also ordered resubmission of the parties' recitations of facts because the parties initially submitted **639** separately numbered facts – all of which were alleged to be material to this case. Given that this case is a garden-variety Title VII, § 1983, and state law claims case, the court found it difficult to believe that 639 facts are truly *material* to the summary judgment motion.

separate claims and which allegations merely serve as supporting evidence of alleged pretext or discriminatory intent. Plaintiff's contentions are often nonsensical, making it even more challenging to ascertain which of the myriad claims asserted by the Plaintiff's Third Amended Complaint have been abandoned and which he continues to assert. Nonetheless, rather than order Plaintiff to submit his brief a *third* time, or to amend his complaint a *fourth* time, the court has undertaken the substantial task of piecing together Plaintiff's claims. In doing so, the court has given the Plaintiff the benefit of the doubt as to what claims he continues to assert.

Plaintiff alleges that he suffered the following adverse actions: (1) he was demoted from his position as Investigator;[27] (2) Busken's comments on his performance evaluation delayed a pay raise; (3) he was removed from the SRT/SWAT team; (4) Weaver ordered him not to carry a firearm while on light duty; (5) his approval for outside employment was delayed; (6) he was subjected to multiple "investigations" and/or was not given notice that he was being investigated; (7) he was not given notice of the "right to appeal" the disciplinary hearing officer's ruling; and (8) Wells announced at a meeting that those who file EEOC complaints are hurtful to the City. For purposes of its analysis, the court assumes that Plaintiff claims that *all* of the above events are discriminatory, retaliatory, *and* the basis for a hostile work environment under Title VII. Plaintiff's § 1983 claims are analyzed separately.

---

[27] Although Plaintiff's opposition brief states that he is "qualified for the same level of pay as similarly situated white officers," (Doc. # 87, at 8), there is no pay claim in this case. Rather, Plaintiff's allegation appears to be offered in support of his demotion claim. Plaintiff was demoted from the position of Investigator/Detective Sergeant. (In May 2001, the City changed the "Detective Sergeant" title to that of Investigator). Plaintiff admits that his pay "is now commensurate with other patrolmen," but complains that "he is making less money than he would have as an investigator or as a sergeant, both positions he is qualified to work [sic] and perform duties." (Doc. # 87, at 8). Plaintiff admits that his pay is equal to that of other similarly situated patrolmen. Therefore, his complaint can only be that he no longer holds the position of Investigator/Detective Sergeant.

**A.     Title VII Disparate Treatment Race Discrimination**

In order to establish a *prima facie* case of disparate treatment based on race, Plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job. *McDonnell Douglas Corp. v. Green*,  411 U.S. 792, 802 (1973); *Holifield v. Reno*, 115 F.3d  1555, 1562 (11th Cir. 1997); *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).

Courts have uniformly held that to establish a *prima facie* case of discrimination or retaliation a plaintiff must establish that he suffered an adverse employment action. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000); *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir.1999); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir.1997); *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1452 (11th Cir. 1998); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994).    To do so, Plaintiff must show a *serious and material change* in the terms, conditions or privileges of employment. *Davis v. Town of Lake Park*, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).

### 1.     Many of Plaintiff's Claims Do Not Rise to the Level of an Adverse Employment Action

As outlined below, many of Plaintiff's claims do not rise to the level of an adverse employment action and therefore, summary judgment is due to be granted as to each of those claims because Plaintiff has failed to establish a *prima facie* case of discrimination.

#### a.     Multiple Investigations/Notice of Investigation

Plaintiff's complaint that, because of his race, he was subjected to multiple "secret" investigations fails because none of those investigations rises to the level of an adverse employment

30

action. First, Weaver's inquiry into Plaintiff's participation in the adult website was not an "investigation" at all. The undisputed evidence indicates that, during an informal discussion with Weaver after sharing a cigarette while working late at the office, Plaintiff admitted that he had designed an adult website and had updated nude pictures on the website. (Affidavit of Weaver). Weaver maintains that there was no need to conduct a formal investigation because Plaintiff freely admitted his involvement with the website. (Weaver Dep., at 36-37, 48-49). Even assuming that her inquiry was "official," it is undisputed that Weaver was not under any obligation to give him notice; the City's policies provide for informal inquiries (Doc. # 68, Ex. Q, § 3.16.1-Informal Inquiry), and also provide that investigations or inquiries can be made without providing notice to the officer "if it would jeopardize the investigation, or if the investigations encountered victims/witnesses who were not willing to cooperate." (Doc. # 68, Ex. Q, § 3.16.4.IV.F.; Dep. of Albright, at 18-19). Although Plaintiff eventually was demoted for his participation in the website, that decision was made after Plaintiff freely admitted his involvement, not as a result of a "covert" investigation. Accordingly, the court finds that Plaintiff's informal discussion with Weaver simply does not rise to the level of an adverse employment action.

The other investigations of which Edwards complains did not result in *any employment action at all.* Albright's investigation of a citizen's complaint that Edwards extorted money was determined to be unfounded and no action was taken. (Albright Dep., at 225). The investigation of the pornographic pictures/videos found on the laptop computer previously assigned to Edwards, in files containing his profile and password, likewise resulted in no adverse action. (Edwards Dep., at 159). The mere fact that Plaintiff was investigated is not sufficient to demonstrate a "serious and material change" in his employment. *Davis*, 245 F.3d at 1238.

31

Plaintiff's claim that he was not given notice of these investigations also fails. The undisputed evidence indicates that the City simply was not under any obligation to inform Plaintiff of these investigations unless and until the City decided to interrogate him. The Police Officer Bill of Rights requires that when a law enforcement officer "is under investigation and is subject to interrogation by members of his agency, for substantial reasons that would likely lead to demotion, or dismissal, . . . [the ] law enforcement officer ...*shall be informed of the nature of the investigation prior to his interrogation.*" (Wells Dep. Ex. 13, at 3.16 8a) (emphasis added). There is no evidence that Plaintiff was ever interviewed about these incidents.[28]

The court finds that Plaintiff has failed to allege an adverse employment action based on investigations or lack of notice of investigations.[29]

## b.   Right to Appeal Disciplinary Hearing Ruling

Plaintiff also complains that Busken failed to represent his interests during his disciplinary hearing and failed to notify him of his "right" to appeal the decision. Despite Plaintiff's protestation that he wanted to appeal the hearing officer's decision, the undisputed evidence demonstrates that there was *no adverse ruling* from his disciplinary hearing for which Edwards should have received a notice of appeal. (Towry Dep., at 60-61, 79-80). Edwards himself testified that he "won" his disciplinary hearing. (Edwards Dep., at 113). Because the hearing officer did not sustain the charges against Edwards or uphold the recommended discipline (Busken Dep., Ex. 6; Edwards Dep., at 113;

---

[28] Even assuming that Defendants owed Plaintiff notice of these investigations, lack of notice is not an adverse employment action either given that Plaintiff was not disciplined as a result of the investigations. Moreover, Defendants have articulated legitimate reasons for these investigations.

[29] Moreover, Edwards admits that there is no evidence, other than his own speculation, that he was investigated or subjected to multiple investigations because of his race. (Edwards Dep., at 127-29).

32

*see also* Edwards Dep., Ex. 21), there was nothing for Edwards to appeal. Although Plaintiff could have filed a grievance when he later received an administrative notice that he had been demoted, he chose not to do so. (Edwards Dep. Ex. 17, Towry Dep., at 60-61, 79-80). This is not an adverse employment action.[30]

### c.   Wells' Announcement Regarding EEOC Charges

Edwards testified that in a departmental "all-hands" meeting, attended by police officers and civilian personnel, Mayor Wells stated that "those that are filing EEOC complaints are not good for the department." (Dep. of Edwards, at 152-53). Wells testified that she said that EEOC complaints were hurtful and disappointing to the department and to the City. (Dep. of Wells at 155-56). Edwards said this statement embarrassed him because he was the only one in the room that he knew of who had filed an EEOC claim. (Dep. of Edwards, at 153).

Although Edwards told a few of the other officers at the meeting that he felt the comment was offensive or retaliatory (Dep. of Edwards, at 153-54), Edwards never mentioned to Chief Busken or Mayor Wells that he found the Mayor's statement to be offensive, nor did he tell Mayor Wells that he thought he was being discriminated against by her statement. (Dep. of Edwards, at 155-56). Regardless, it is undisputed that Wells took no action against Edwards. (Edwards Dep., at 152-54). The fact that Wells made a wholly imprudent statement (and one that Edwards did not like) in which Wells did not even name Edwards, does not qualify as an adverse employment action.

---

[30] Plaintiff also generally alleges that Busken violated his rights at the hearing by not adequately "representing his interests." He has not shown how his rights purportedly were violated by Busken or how this claim rises to the level of a "serious and material change" in his employment—especially given that the outcome of the hearing was favorable to him.

33

**2.    The Remainder of Plaintiff's Claims Fail Because Plaintiff Has Not Shown That Defendants' Legitimate Non-Discriminatory Reasons for the Decisions Were a Pretext for Discrimination**

With respect to the remainder of Plaintiff's claims – his demotion, the altering of his performance evaluation, his removal from the SRT/SWAT team, his light duty instructions, and the delay in allowing him to perform outside employment – the court will assume, without deciding, that Plaintiff has established a *prima facie* case of discrimination.[31]   Accordingly, the burden shifts to the Defendants to articulate one or more legitimate, nondiscriminatory reasons for the employment actions in question. A reason offered may be either objective or subjective if it is premised upon facts that are particular (*i.e.,* clear and reasonably specific). *Chapman v. AI Transport*, 229 F.3d 1012, 1034-35 (11th Cir. 2000); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1280 (11th Cir. 2000). Neither the court nor the Plaintiff should presume to judge whether an employment decision is fair or wise, but only whether it is legal. *Chapman*, 299 F.3d at 1030 n.19.

Once the employer articulates a legitimate, non-discriminatory reason for its decision, "the factual inquiry proceeds to a new level of specificity." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "In order to prevail, the plaintiff must [then] establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination."

---

[31] The court notes, however, that Defendants present a compelling argument that Plaintiff fails to establish a *prima facie* case of discriminatory demotion because Edwards was no longer qualified for the position at issue. Defendants point out that, although Edwards was qualified for the position of Investigator of Vice/Narcotics *with the City*, this position was in the process of being reassigned to the direction and supervision *of an outside agency*, STAC, at the time of Edwards' demotion. Winn, the commander of STAC (who was not a City employee), testified that he told Weaver and Busken that he would not recommend Edwards to fill one of the two investigator positions the City was to provide for STAC due to Edwards' association with the adult website he admittedly designed and maintained. (Affidavit of Sgt. Winn). Thus, in Winn's estimation, Edwards was not qualified for the new STAC position to which his former position was being transferred.

34

*Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998). To meet this burden, Edwards must "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997). Although he may include evidence of his *prima facie* case in his proof of pretext, a plaintiff may not merely rest on the laurels of his *prima facie* case in the face of justification evidence offered by the defendant. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987). As outlined below, summary judgment is appropriate because Plaintiff failed to show that the remainder of the decisions at issue were a pretext for race discrimination.

### a. Demotion

Although Plaintiff claims that he was demoted as a result of his race, the undisputed evidence shows that Plaintiff was demoted for legitimate, nondiscriminatory reasons. It is undisputed that Plaintiff admitted to designing and maintaining an adult website on which he had placed explicit nude photographs of women. (Edwards Dep., at 12, 74). It is also undisputed that Edwards' position as a Vice/Narcotics Investigator was in the process of being reassigned to the newly formed STAC, and that the STAC commander unequivocally stated that, because of Edwards' involvement with the website, he would contest the appointment of Edwards to STAC should Busken go forward with recommending him. (Affidavit of Busken; Affidavit of Sgt. Winn). Thus, the City decided to demote Edwards.[32]

---

[32] The City maintains that even the dismissal of Edwards for such behavior would have been appropriate. *See City of Mobile v. Trott*, 596 So.2d 921, 923 (Ala. Civ. App. 1991) (holding that a city's dismissal of a police officer who was off-duty when he took allegedly obscene photographs

In an attempt to show pretext, Plaintiff points to the following: (1) white officers treated differently than Edwards and (2) the "process by which Ray Edwards was demoted." (Doc. # 87, at 8). Neither of these approaches is persuasive.[33]

Edwards claims that other white officers exercised bad judgment but were not demoted when they engaged in the following activities: adultery, falling asleep on the job, driving a City vehicle after having been at a party where alcohol was served, contemplating suicide, macing a spitting inmate, and receiving a hand job while investigating a prostitution ring. As outlined in the recitation of undisputed facts, *supra* Section II.M., several of the incidents identified by Plaintiff were only rumored to have occurred or were never reported to supervisors. (Affidavits of Weaver and Busken). As to the other allegations, those individuals were investigated and action was taken.[34] None of the

of a model and obtained release authorizing their distribution on charges of conduct unbecoming a police officer was proper); *Freman v. City of Mobile*, 590 So.2d 331, 332-33 (Ala. Civ. App. 1991) (evidence supported dismissal of police officer for unbecoming conduct giving rise to charges of gun play and two acts of perverse, abusive, and harassing sexual behavior with former wife, two daughters, co-employees and prostitute).

[33] As noted earlier, Plaintiff has not clearly delineated which allegations form the basis of separate claims and which allegations are offered as evidence of pretext. Thus, to the extent that Plaintiff's pretext argument also relies on his removal from the SRT/SWAT team, Busken's comments on his performance evaluation, Weaver's light duty orders, the delay in approval for his outside employment, the "investigations" of his conduct, the events at his disciplinary hearing, or Wells' EEOC statement, the court finds those allegations insufficient to show pretext for the same reasons that the court finds them insufficient to survive summary judgment as separate claims.

[34] Specifically, a white officer was investigated for committing adultery and ultimately demoted because of it. (Moore Dep., at 37; Affidavit of Busken). Another white employee who fell asleep on the job was counseled by his supervisor. (Affidavit of Weaver). The City investigated the officer who maced an inmate, and it was determined that his actions were not in violation of policy. (Weaver Dep., at 221-26). The officer involved in the investigation of the prostitution ring was investigated, although it was determined that he was inexperienced and new to those types of investigations. (Affidavit of Busken). The officer who "contemplated suicide" was having marital problems. (Affidavit of Busken).

36

evidence related to these individuals demonstrate that Defendants' reasons for demoting Edwards were pretextual.

In any event, Edwards has failed to point to any comparator *similarly situated to him* who was treated more favorably because of race. The Eleventh Circuit reiterated the standard for determining whether employees are similarly situated in *Silvera v. Orange County School Bd*, 244 F.3d 1253, 1259 (11th Cir. 2001):

> In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir 1998)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)), opinion modified by 151 F.3d 1321 (11th Cir.1998). "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted). In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir.1999) (citations omitted).

244 F.3d at 1259 (emphasis added). In other words, to meet the comparability requirement, Plaintiff must show that he is "similarly situated in *all relevant aspects* to the non-minority employee." *Silvera*, 244 F.3d at 1259 (citing *Holifield*, 115 F.3d at 1562) (emphasis added). He must demonstrate that the alleged misconduct of the comparator was "nearly identical" to that misconduct in which he engaged. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

Edwards has offered no evidence that a white officer has ever been accused of, and admitted to, designing and maintaining an adult website containing sexually explicit photos. Likewise, there

is no evidence that STAC leader Winn has ever refused to recommend another officer for the STAC assignment, leaving the City with little choice other than to put Edwards in a different position given that the decision had already been made to transfer his job to a STAC assignment. Edwards has not identified any individual whose misconduct and circumstances were "nearly identical" to his own. *Nix*, 738 F.2d at 1185. That Edwards believes other officers in the department exercised "bad judgment" and should have been demoted does not establish that the City's legitimate, non-discriminatory reasons for demoting him were pretextual.

Moreover, although Plaintiff quarrels with the "process by which he was demoted," the undisputed facts indicate that the progression from written warning to demotion was unrelated to Plaintiff's race. Although Busken originally intended for Edwards's discipline to be a written warning, and gave him notice of the same, the situation changed because of Winn's refusal to support a recommendation of Edwards to STAC. (Affidavit of Busken). At that point, Edwards and Busken discussed the possibility of a voluntary demotion (Edwards Affidavit), and Edwards prepared a memorandum entitled "Voluntary Demotion" which was sent to Chief Busken. (Dep. of Edwards, at 93-94; Affidavit of Busken; Edwards Dep., Ex. 13.). However, the tone of the memorandum was not voluntary, and therefore the City Attorney advised Busken that he would have to pursue demotion by other means. (Affidavit of Busken; Dep. of Busken, at 100-08). Busken believed the only other option was to demote Edwards based on disciplinary reasons. (Affidavit of Busken).[35]

Although Busken previously had not initiated two separate disciplinary actions arising out

---

[35] The disciplinary hearing officer did not uphold the proposed demotion for *disciplinary* reasons, although he did find that Edwards' position had been abolished. (Affidavit of Busken). Thus, when it was all said and done, Edwards was demoted administratively, in a non-disciplinary fashion. (Affidavit of Busken).

38

of the same conduct against any white employees (Dep. of Busken at 141-42), Busken only used the

disciplinary process to seek Edwards' demotion from his position from investigator because the City

did not accept Edwards' voluntary demotion. (Dep. of Busken at 101-02). This is not evidence of

pretext.[36]

The salient question is whether the Defendant's articulated reasons, even if incorrect in the

eyes of Plaintiff, were the real reasons for his demotion. There is no substantial evidence suggesting

that they were not. Because Plaintiff has not shown that Defendant's assessment was a pretext for

or motivated by discrimination, summary judgment is appropriate on his demotion claim.

### b.    Performance Evaluation

Edwards also claims that Busken lowered the rating on his performance review in the

"judgment" category which resulted in a delayed pay raise.[37] The undisputed evidence demonstrates,

however, that Busken questioned Edwards' judgment because of Edwards' admitted involvement

with the adult website and because Weaver told Busken that Edwards had admitted to taking nude

photographs that were placed on the website (although Edwards later denied this to Busken).

---

[36] Plaintiff also alleges that the City misrepresented to him that his position was being "abolished," when it was not. The undisputed facts demonstrate that this is nothing more than a semantic dispute. The notice of proposed demotion prepared by Busken informed Edwards that his position would no longer exist because of the transition of that position to STAC. (Dep. of Busken, at 106-08; Busken Dep., Ex. 11). Although the undisputed evidence indicates that the general position of "Investigator" at the City was not abolished – because other employees still retain that title – the two Investigator positions assigned to Vice/Narcotics were transferred to STAC supervision and, as of October 2002, were no longer under the City's direction. (Affidavits of Busken and Sgt. Winn). Thus, for all practical purposes, Edwards' job as it had previously existed was "abolished."

[37] Defendants dispute that Edwards' pay increase was delayed. (Dep. of Towery, at 188-90).

(Affidavit of Busken).[38]

Although Plaintiff quarrels with Defendant's conclusion that he exercised poor judgment, Plaintiff admits to his involvement in the adult website. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989) (finding that employee's "[a]dmission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct"). Plaintiff's personal opinion that his actions do not demonstrate bad judgment does not create a genuine issue of material fact as to whether Busken honestly believed that Plaintiff demonstrated poor judgment. *Holifield v. Reno*, 115 F. 3d 1555, 1565 (11th Cir. 1997) (reiterating that the opinion of the decision-maker, not the employee's own perception of his own abilities, is what matters in an intentional discrimination case). Defendant's assessment of Plaintiff's character, albeit subjective, is premised upon facts that are clear and reasonably specific. *Chapman*, 229 F.3d at 1034-35.

Summary judgment is appropriate on this claim because Defendant has articulated a legitimate reason for Busken's comment on his performance evaluation, and Plaintiff has not shown that Busken included such a comment because of race discrimination.[39]

### c.   Removal from the SRT/SWAT Team

Edwards also alleges that his removal from the SRT/SWAT team was discriminatory. Weaver's testimony is clear, however, that her opinion of Edwards' judgment was greatly compromised after Edwards admitted to his involvement with the adult website and taking nude

---

[38] After Busken submitted his comments, it became apparent that Busken had considered conduct outside of the evaluation period. (Dep. of Busken, at 238). Accordingly, Busken changed his comments. (Dep. of Edwards, at 202; Edwards Dep., Ex. 31).

[39] Moreover, the undisputed evidence indicates that Edwards still received his scheduled raise.

photographs of women. (Affidavit of Weaver). Because Edwards later told Busken that he did not take any of those photographs, and denied ever telling Weaver that he had, Weaver also had credibility issues with Edwards. (Affidavit of Weaver). In addition, the team leader of the SRT/SWAT reported to Weaver that he and other team leaders had concerns regarding Edwards' judgment. (Affidavit of Weaver). Accordingly, Weaver recommended that Edwards be removed from the SRT/SWAT team. (Affidavit of Weaver). Summary judgment is appropriate on this claim because there is no indication that Weaver's concerns about Plaintiff were false or a pretext for race discrimination.[40]

### d.    Light Duty Instructions

Plaintiff also believes that Weaver ordered Plaintiff not carry his badge or weapon while on light duty because of his race. The record is undisputed that Weaver consistently required officers under her supervision who were on light duty to remove their badges and weapons for safety reasons. (Affidavit of Weaver). Although Plaintiff points to white officers who were not told to remove their weapons and badges while on light duty, none of them were under Weaver's supervision. (Affidavit of Weaver). There is simply no evidence that Weaver's request that Edwards not carry a badge and weapon while he was on light duty had anything to do with his race, and summary judgment is due to be granted on this claim.

### e.    Delayed Outside Employment

Finally, Edwards complains that the City delayed his approval for off-duty employment which resulted in lost wages. The undisputed evidence demonstrates that on November 19, Edwards

---

[40] Moreover, Edwards did not receive any loss in pay related to this removal. (Edwards Dep., at 247).

41

applied for off-duty employment and on November 20, Busken gave him an "off-duty employment agreement" and asked him to complete it. (Affidavit of Busken; Dep. of Busken, at 211-23; Ex. 20).[41] Nonetheless, Plaintiff waited until some two months later to submit the completed off-duty employment agreement. (Busken Dep., Ex. 20). Three days after the agreement was submitted to the City, Chief Busken asked Edwards to complete a MPD Off-Duty Employment Approval Request form no later than January 29, 2003. (Affidavit of Busken). Thereafter, Plaintiff's request was approved by both the Chief and the Mayor. (Affidavit of Busken; Busken Dep., Ex. 21). The undisputed evidence demonstrates no delay on the part of the City in approving Plaintiff's request for off-duty employment, much less a delay that was as a result of race discrimination.

Although Plaintiff complains that Brian Tapley, a white officer, was allowed to begin working his off-duty employment seven (7) days before his paperwork was completed, the undisputed evidence shows that Tapley was allowed to work earlier because the school where he was to work had an urgent need for his services and because the City Attorney had not yet prepared the off-duty employment agreement at the time of Tapley's request. (Dep. of Busken, at 214-15, 222).[42] There is no indication that the difference between Tapley and Plaintiff's situations was race-related, and summary judgment is due to be granted on this claim.

For the reasons outlined above, summary judgment is appropriate on all of Plaintiff's Title

---

[41] The police department policy regarding secondary employment states that, in order to engage in off-duty employment, officers must seek written approval through the chain of command from the police chief. (Affidavit of Busken).

[42] In late July 2002, Chief Busken received a phone call from the Madison City Schools regarding a need to have officers escort a special needs student, and he immediately posted a notice advising interested officers to submit a written request. (Affidavit of Busken). Tapley requested the position.

42

VII disparate treatment claims.

## B. Retaliation

Plaintiff also generally alleges that he has suffered retaliation during his City employment. Plaintiff's retaliation "argument" consists only of (1) one reference to "retaliation" in a general heading in his opposition brief (Doc. # 87, at 2), and (2) the pronouncement that Mayor Wells' statement regarding EEOC charges constitutes direct evidence. (Doc. # 87, at 5). In order to establish a *prima facie* case of retaliation, Plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196-97 (11th Cir. 1997). Plaintiff has the burden to show that "the protected activity and the adverse action were not wholly unrelated." *Clover v. Total System Servs., Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999)(citation omitted).

Plaintiff's brief contains no analysis of how he has satisfied his *prima facie* burden. Plaintiff fails to show how any of the adverse employment actions about which he complains are causally connected to the filing of his EEOC charge or judicial complaint.[43] Although some of the adverse actions alleged in this case occurred after the filing of his EEOC charge and judicial complaint, the mere fact that these events occurred after Edwards filed his claims is insufficient to state a claim for retaliation. *See Gupta*, 212 F.3d 571, 590 (11th Cir. 2000); *Sullivan v. National Railroad & Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

Moreover, as already outlined above, summary judgment is appropriate as to Plaintiff's

---

[43] In fact, the only specific mention of retaliation in Plaintiff's Third Amended Complaint is in reference to Plaintiff's claim that he was ordered not to carry his firearm or badge while on light duty.

43

claims because (1) as to many of the alleged events, Edwards has suffered no adverse employment

action and (2) as to the remainder of the alleged events, Defendants have articulated legitimate,

nondiscriminatory reasons for their decisions which Plaintiff has not demonstrated are pretextual.

*See Bullock v. Widnal*, 953 F.Supp. 1461, 1473 (M.D. Ala. 1996), citing *Wu v. Thomas*, 996 F.2d

271, 274 (11th Cir. 1993); *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (holding

that "not everything that makes an employee unhappy is retaliation" and finding no retaliation

liability for a negative performance evaluation). There is no evidence that any of the decisions about

which Plaintiff complains occurred *because of* retaliation.

## C.     Hostile Work Environment

Plaintiff also asserts a claim of abusive work environment racial harassment. Title VII

provides that an employer "shall not discriminate against any individual with respect to his terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin . . . ." 42 U.S.C. § 2000e-2(a)(1) (1994). A plaintiff attempting to show that he has

been subjected to an abusive work environment by a supervisor must prove a number of elements

to establish the claim. These elements include proof that: (1) the employee belongs to a protected

group; (2) the employee has been subject to unwelcome harassment; (3) the harassment was based

on the race of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms

and conditions of employment and create a discriminatorily abusive work environment; and (5) a

basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.

1999) (en banc).

A *prima facie* showing of a hostile work environment arises only where the racial harassment

is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working

44

environment." *Faragher*, 524 U.S. at 786 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). The court's interpretations of the general standard announced in *Meritor* "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998)). For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. *See id.* Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level. That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787. This issue is to be determined by reviewing the totality of the circumstances. *Henson*, 682 F.2d at 904. Additional factors for courts to consider in the totality analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

In this case, just as with Plaintiff's retaliation claim, Plaintiff provides no analysis of the *prima facie* elements of his hostile environment claim. In his deposition, Plaintiff identified the following conduct that he claims created a hostile work environment: (1) John Stringer's references to African-American individuals as "colored;" (2) Weaver's implication that Edwards sounded too educated to be black, (3) Busken's reference to an African-American officer as "Dark Chocolate", (4) the use of "C" for "Colored" in the City's arrest book; (4) Glassman's use of the "n" word to another employee outside of Plaintiff's presence; and (5) Wells' comment that people who filed EEOC complaints were hurting the department. (Edwards Dep., at 148-152, 152-153, 178-180,

45

189-192, 270-272).[44]

The court finds that Plaintiff has not met his burden of establishing a *prima facie* case of hostile work environment racial harassment. He must demonstrate to the court that he was harassed because of his race, African-American, and that the conduct as alleged was sufficiently severe or pervasive to alter the terms and conditions of his employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 n. 5 (11th Cir. 1999) (applying "but for the fact of [his race, he] would not have been the object of harassment" test). Whether the racial harassment to which Plaintiff was exposed was sufficiently severe or pervasive is a question to be determined with regard to the totality of the circumstances. "Relatively isolated" instances of non-severe misconduct will not support a hostile work environment claim. *See Saxton v. Am Telephone & Telegraph Co.*, 10 F.3d 526, 533 (11th Cir. 1993). Therefore, when considering whether Defendant's conduct meets the severe or pervasive threshold, this court considers: the frequency of the conduct, its severity, whether the behavior is physically threatening or humiliating, and if the conduct interferes with the employee's abilities to perform his duties. *See Mendoza*, 195 F.3d at 1246.

When all factual disputes and justifiable inferences are resolved in favor of the Plaintiff, the court finds that Plaintiff has failed to adduce sufficient evidence of a hostile work environment. None of the conduct alleged was physically threatening, nor has Plaintiff alleged that any of the

---

[44] To the extent Plaintiff seeks to rely on his demotion, Busken's performance evaluation comments, his removal from the SRT/SWAT team, Weaver's light duty instructions, his approval for outside employment, the multiple "secret" investigations, or his lack of notice of the "right" to appeal his hearing as further evidence of a hostile work environment, these incidents have nothing to do with Plaintiff's race and therefore are not properly the basis of his harassment claim. Because Title VII does not regulate the "general civility" of employees, *see Faragher*, 524 U.S. at 788, conduct that may be counted as contributing to a hostile environment *must be of a race-related nature* and not "[i]nnocuous statements or conduct" that bear no relation to race, *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

46

comments interfered with his ability to work.  Moreover, the incidents alleged were infrequent, taking place at undetermined times over the span of Plaintiff's employment at the City, and several of the comments took place out of Plaintiff's presence and/or were not directed to Plaintiff at all. Taking all of this under consideration, the court finds that the conduct in this case does not rise to the level of being severe or pervasive such that it altered the terms and conditions of Plaintiff's employment. While much of the conduct alleged is unseemly, unprofessional, and boorish, it simply does not rise to the level of severe or pervasive.  The undisputed facts in this case indicate that the work atmosphere was neither "charged with racial hostility" nor abusive. *Edwards*, 49 F.3d at 1521.

Therefore, the court finds that summary judgment is appropriate because Plaintiff has failed to adduce sufficient evidence on his hostile environment claim to create questions of fact for the jury.

## D.      § 1983 – Substantive Analysis of Claims

Under § 1983, Plaintiff alleges that Defendants Busken, Weaver, and Wells violated his constitutional rights to procedural due process, substantive due process, and equal protection. Although Plaintiff's Third Amended Complaint lists a number of specific claims under § 1983, Plaintiff has abandoned many of those claims.[45]   The court addresses below only those claims that Plaintiff continues to assert in opposition to summary judgment.

### 1.       Procedural due process rights

Plaintiff's procedural due process allegations in this case center on his disciplinary hearing,

_____

[45] Plaintiff's Third Amended Complaint alleged the following § 1983 claims: (1) as to Busken, "improperly conduct[ing] investigations against [him] and improperly attempt[ing] to discipline [him];" "improperly forc[ing] [him] to accept a demotion;" and "improperly remov[ing him] from his position on the S.W.A.T. team" (Count III); (2) as to Weaver, "improperly conduct[ing] investigations against [him];" "improperly forc[ing him] from carrying a firearm;" and "improperly remov[ing him] from the S.W.A.T. team" (Count IV); and (3) as to Wells, "prohibit[ing] him] from pursuing legal claims and creat[ing] a racially hostile work environment" (Count V).

47

and he claims that: (1) Defendants failed to provide him with "a notice of his right to appeal adverse employment disciplinary action;" (2) Defendant Busken "abdicated his duty" to ensure that Plaintiff's rights were protected during the disciplinary process and affirmatively requested from the disciplinary hearing officer that he make clear his findings that Edwards was to be demoted; and (3) Defendant Busken "used the exact same charges resulting from the exact same conduct to institute a second disciplinary action against Ray Edwards in an attempt to ensure Ray Edwards' demotion." (Doc. # 87, at 9-10).[46]

An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).[47] "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). However, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971). "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this [] would intrude to an unwarranted extent on

---

[46] Although Plaintiff also claims that the "disciplinary hearing officer ma[de] a finding regarding the action to be taken against Ray Edwards, which [was] clearly outside his authority pursuant to the City's policies and procedures," (Doc. # 87, at 10), this is not a claim before the court given that Plaintiff has not brought a § 1983 claim against the disciplinary hearing officer.

[47]The Supreme Court has described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

48

the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S.
at 542.

Summary judgment is appropriate on Plaintiff's procedural due process claims because his
allegations are nothing more than unfounded assertions – not due process violations. First, although
Plaintiff claims that he was denied notice of his "right" to appeal, the facts are clear that Plaintiff in
fact *did not have the right to appeal* the hearing officer's findings. As discussed earlier, the
undisputed evidence demonstrates that there was *no adverse ruling* from his disciplinary hearing for
which Edwards should have received a notice of appeal. (Towry Dep., at 60-61, 79-80). Because
the hearing officer did not sustain the charges against Edwards or uphold the recommended
discipline (Busken Dep., Ex. 6; Edwards Dep., at 113; *see also* Edwards Dep., Ex. 21), there was
nothing for Edwards to appeal. Edwards' demotion, although originally instituted for disciplinary
reasons, was effected through administrative means after the hearing officer issued his findings, and
there is no right to appeal from such action. (Edwards Dep., Ex. 17; Towry Dep., at 60-61; 79-80).
Plaintiff could have filed a grievance; but he did not. (*Id*.).

Plaintiff also fails to provide any citation to the record – and the court has been unable to find
any evidence – in support of his claim that Busken requested a ruling from the hearing officer or
failed to ensure that Plaintiff's rights were protected during the hearing. As noted earlier, Edwards
has stated that he "won" his disciplinary hearing. (Edwards Dep., at 115). Moreover, although the
evidence demonstrates that the hearing officer was asked to provide clarification because his initial
ruling caused some confusion with City officials, (Dep. of Busken, at 127-28), there is no evidence
to support Plaintiff's contention that *Busken* requested a *specific* ruling from the hearing officer.

Finally, Edwards' claim that Busken violated his procedural due process rights by issuing a

49

second disciplinary action against him is unsupported by the evidence.    It is undisputed that at the

time the written warning was issued, Busken thought that Edwards could still be assigned to STAC.

(Affidavit of Busken; Busken Dep., at 57-60).  Once Winn made it unequivocally clear that such

assignment would not be approved, Busken had to find an alternative means of dealing with the fact

that, within a few months, Edwards would be left without a job at all if he was not moved to another

position.  (*Id.*).  Busken therefore chose to demote Edwards.  (*Id.*).  After the hearing officer issued

his findings that Edwards' position technically had been abolished, the demotion was not even

disciplinary, but merely administrative.    There is no evidence that, given these circumstances,

Edwards even had a right under the due process clause not to be demoted.

Accordingly, because Plaintiff has failed to show that any of his allegations do, in fact,

constitute true violations of due process rights, summary judgment is appropriate on these claims.

## 2.    Right to Equal Protection

In order to establish a violation of the Equal Protection Clause, Plaintiff must prove

discriminatory motive or purpose. *Cross v. State of Ala., State Dept. of Mental Health & Mental*, 49

F.3d 1490, 1507 (11th Cir. 1995). "[S]uch intent should be inferred in the same manner as [the

Supreme Court] said it is inferred under [Title VII]." *Whiting v. Jackson State University*, 616 F.2d

116, 121 (5th Cir.1980). Thus, "in a case such as this alleging disparate treatment, in which § 1983

is employed as a remedy for the same conduct attacked under Title VII, 'the elements of the two

causes of action are the same.'  In both instances, the plaintiff must prove that the defendant acted

with discriminatory intent. Identical methods of proof, as described in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are also employed." *Richardson v.*

*Leeds Police Department*, 71 F.3d 801, 805 (11th Cir. 1995) (internal citations omitted). Thus, for

50

the same reasons summary judgment is due to be granted on Plaintiff's Title VII claims, as discussed in Section III.A. *supra*, the court finds that summary judgment is due to be granted as to Plaintiff's equal protection claims under § 1983.[48]

### 3. Substantive Due Process

Finally, Plaintiff claims that his right to liberty was deprived because he "suffered the stigma of a black African-American who had been railroaded into a demotion, been declared over and over again to have bad judgment and to have labeled as "tainted" by his superiors." (Doc. # 87, at 12).[49] The court finds Plaintiff's allegations insufficient to state a violation of substantive due process. "[S]tigmatization by itself is insufficient to rise to the level of a protected liberty interest." *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir. 2003). In *Paul v. Davis*, 424 U.S. 693 (1976), the Supreme Court held that a person's interest in reputation alone, "apart from some more tangible interests such as employment," is not a protected liberty interest within the meaning of the

---

[48] Plaintiff further argues, without citation to the record, that he did not receive equal protection because "two other officers who received demotions as a result of disciplinary actions were demoted as a result of a disciplinary hearing based on the disciplinary hearing officer." It is unclear what, if anything, this unsupported statement seeks to prove. Regardless, as noted earlier, the undisputed evidence indicates that Plaintiff was demoted administratively because his position was abolished, not based on the disciplinary hearing.

[49] Although Plaintiff also claims that his right to substantive due process was violated when he was demoted (and allegedly denied his property right to his job), this argument is foreclosed by *McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994) and *Bussinger v. City of New Smyrna Beach, Fla.*, 50 F.3d 922 (11th Cir. 1995). In *McKinney*, the Eleventh Circuit held that "areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'" *McKinney*, 20 F.3d at 1556 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring)). In *Bussinger*, the court further clarified, that "*McKinney* held that an employee with a protected interest in his job may not maintain a substantive due process claim arising out of his termination." *Bussinger*, 50 F.3d at 925. Under this authority, Plaintiff may not claim a substantive due process claim arising out of demotion.

51

due process clause. *Paul*, 424 U.S. at 701. "To establish a liberty interest sufficient to implicate the fourteenth amendment safeguards, the individual must be not only stigmatized but also *stigmatized in connection with a denial of a right or status previously recognized under state law*." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302-03 (11th Cir.2001) (emphasis added). "In other words, a 'stigma-plus' is required to establish a constitutional violation." *Smith*, 322 F.3d at 1297.

In this case, although Edwards was demoted from his position, it was not his perceived stigmatization which led to his demotion, but rather his *admitted* involvement in designing and maintaining an adult website. Thus, Edwards fails to show stigmatization in connection with the denial of a right recognized under state law. Any stigma attached to Edwards' situation was a product of his own actions and admissions, not the denial of a substantive due process right by the City. Thus, Plaintiff fails to state a claim for a violation of substantive due process.

For the reasons outlined above, summary judgment is appropriate on all of Plaintiff's § 1983 claims.

## E.    § 1983 – Qualified Immunity

Alternatively, the court finds that summary judgment is due to be granted as to Plaintiff's §1983 claims because Defendants Busken, Wells, and Weaver are each due qualified immunity. Qualified immunity offers complete protection for government officials sued in their individual capacity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless h[is] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed

52

them." *GJR Investments, Inc. v. County of Escambia, Fla*., 132 F.3d 1359, 1366 (11th Cir. 1998).

The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors

in all but exceptional cases, courts should think long and hard before stripping defendants of

immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th

Cir.1994). "We generally accord ... official conduct a presumption of legitimacy." *United States*

*Department of State v. Ray,* 502 U.S. 164, 179 (1991).

Under the qualified immunity doctrine, government officials performing discretionary

functions are immune from suit unless the alleged conduct violates "clearly established [federal]

statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S.

at 818.[50] "Qualified immunity operates to ensure that before they are subjected to suit, officers are

on notice their conduct is unlawful." *Hope v. Pelzer*, 122 S. Ct. 2508, 2515 (2002) (internal

quotations omitted). "This is not to say that an official action is protected by qualified immunity

unless the very action in question has previously been held unlawful; but it is to say that in the light

of pre-existing law the unlawfulness must be apparent." *Pelzer*, 122 S. Ct at 2515 (internal

quotations omitted).

## 1. Discretionary Authority

As a threshold matter, the government official first must show that he acted within his

discretionary authority; in other words, that "objective circumstances [exist] which would compel

the conclusion that his actions were undertaken pursuant to the performance of his duties and within

_____

[50] "Clearly established" rights must be "developed [] in a concrete factual context so as to
make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v.
Creighton*, 483 U.S. 635,640 (1987). Only Supreme Court, Eleventh Circuit, and Alabama Supreme
Court cases can "clearly establish" the law in this Circuit. *Thomas v. Roberts*, 323 F.3d 950, 955
(11th Cir. 2003).

the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). In determining whether this test is met, there is no analysis of whether the official actually acted lawfully. See *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992). Rather, the issue is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the governmental officer's] discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). As such, "[i]t is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority." *Godby v. Montgomery Co. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998).

Given this broad standard, the court finds that Busken, Weaver and Wells were acting "pursuant to the performance of [his/her] duties" and "within the scope of [his/her] authority" when they engaged in the conduct forming the basis for Plaintiff's procedural due process, substantive due process, and equal protection claims. (*See* discussion Section III.D., *supra*, for a more specific outline of the alleged conduct.) The court is not persuaded by Plaintiff's argument that Defendants were not acting within the scope of their authority because they acted maliciously, willfully, or in bad faith.[51] Even assuming that Defendants acted in bad faith, their acts are still discretionary *if* such

---

[51] Plaintiff complains that the following actions by Busken indicate he was acting in bad faith: (1) during the first disciplinary action which resulted in a written warning, Busken assured Plaintiff that this "would conclude the matter;" (2) Busken misrepresented to Plaintiff that his position was abolished; (3) when Busken determined that Plaintiff's demotion would not be considered "voluntary," he instituted a second disciplinary action against Plaintiff for the same charges arising out of the same conduct; and (4) during the course of the disciplinary hearing, Busken abdicated his duty to ensure Plaintiff's rights were protected and sought action from the disciplinary hearing officer which contravened Plaintiff's rights. Plaintiff points to the following "bad faith" conduct by Weaver: (1) Weaver failed to inform Plaintiff that her conversations with him regarding his participation in a website were part of an "official" investigation; (2) in her memorandum to Busken, Weaver recommended disciplinary action to be taken against Plaintiff; and (3) Weaver requested Plaintiff's removal from the SRT/SWAT team.

acts done for a proper purpose would be within the scope of their discretionary authority. *See Rich,* 841 F.2d at 1562; *Stough v. Gallagher,* 967 F.2d 15223, 1526 (11th Cir. 1992).

Moreover, Plaintiff's argument that Defendants' actions were ministerial – not discretionary – is simply off the mark. Plaintiff claims that the following adverse actions were purely "ministerial," and not discretionary: (1) Weaver's alleged failure to inform Plaintiff that their "conversation" regarding his participation in the website was an "official" act; (2) Weaver's alleged inappropriate recommendation of disciplinary action for Edwards in her memorandum to Busken; (3) Busken's alleged failure to inform Plaintiff – prior to taking the second disciplinary action against him – that their "discussion" regarding the allegations against Plaintiff was "official;" (4) Busken's alleged failure to give notice to Plaintiff that he was being "investigated" for inappropriate material on his laptop and extortion of money from an informant; and (5) Busken's and Wells' alleged failure to provide Plaintiff with a notice of his right to appeal the disciplinary hearing results.

As noted above, the Eleventh Circuit has made it clear that the term "discretionary authority" includes all actions of a government official that (1) were "undertaken taken pursuant to the performance of his duties," and (2) were "within the scope of his authority." *Rich,* 841 F.2d at 1564. In *Jordan v. Doe,* 38 F.3d 1559 (11th 1994), the court found that, "'it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act challenged.'" *Jordan v. Doe,* 38 F.3d 1559, 1566 (11th 1994) (quoting *Coleman v. Frantz,* 754 F.2d 719, 727 (7th Cir.1985)); *see also McIntosh v. Weinberger,* 810 F.2d 1411, 1432 (8th Cir.1987) (finding "no recent case ... in which a court has rejected qualified immunity simply because the official in question was performing a ministerial duty"), *vacated and remanded on other grounds sub nom. Turner v. McIntosh,* 487 U.S. 1212 (1988).

55

Just as in *Jordan*, Edwards does not dispute the fact that Defendants were acting pursuant to the their job functions and within the scope of their authority; rather, he maintains that their actions were purely ministerial. "[W]hether such actions be characterized as ministerial or discretionary in nature," they "clearly fall within the *Rich* definition of 'discretionary authority.'" *Jordan*, 38 F.3d at 1566. Accordingly, the court concludes that the acts of which Plaintiff complains were within the discretionary authority of Busken, Wells, and Weaver.

## 2.   Violation of a Clearly Established Right

Having determined that the government actors in this case were operating within their discretionary authority, the court must ask whether the Plaintiff's allegations, if true, establish the violation of a constitutional or statutory right. *Bogle v. McClure,* 332 F.3d 1347, 1355 (11th Cir. 2003) (citing *Hope v. Pelzer,* 536 U.S. 730, 736 (2002) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established." *Bogle*, 332 F.3d at 1355.

Plaintiff's § 1983 claims consist of alleged violations of his rights to procedural due process, equal protection, and substantive due process. As described in Section III.D.1 and III.D.3 *supra*, even assuming that Plaintiff's allegations under § 1983 are true, they are not sufficient under the law to establish violations of his rights to procedural due process or substantive due process. Therefore, Defendants are due qualified immunity on Plaintiff's procedural due process and substantive due process claims because Plaintiff's allegations do not establish the violation of a constitutional right.

With respect to Plaintiff's equal protection allegations (which mirror his Title VII claims), Defendants are due qualified immunity as to Plaintiff's claims that he was subjected to multiple

56

"secret" investigations, was not informed to his right to appeal the disciplinary hearing ruling, and was subjected to Wells' statement regarding EEOC charges because, as discussed in Section III.A.1.a-c *supra,* even assuming Plaintiff's allegations are true, they do not rise to the level of an adverse employment action and thus do not constitute violations of the Equal Protection Clause. "In order for a government employee to be held liable in his individual capacity, it must be clearly established that the government employee's action was an adverse - employment action at the time the act was taken." *Portera v. State of Alabama Department of Finance*, 322 F.Supp.2d 1285, 1287 (M.D. Ala. 2004).

With respect to the only remaining claims – demotion, delayed pay raise due to negative comments on a performance evaluation, removal from the SRT/ SWAT team, not being allowed to carry a firearm on light duty, and lost wages due to a delay in his approval for outside employment – even if Plaintiff's so-called "facts" are deemed stipulated facts, and even if Defendants did violate Edwards' constitutional rights by taking adverse employment actions against him on the basis of his race for his protected conduct,[52] the court finds that Defendants are still due qualified immunity under Eleventh Circuit law based on *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996).

### 3.   *Foy v. Holston* and Its Progeny

Defendants argue that they are entitled to qualified immunity as to Plaintiff's claims of demotion, delayed pay raise due to negative comments on a performance evaluation, removal from the SRT/ SWAT team, not being allowed to carry a firearm on light duty, and lost wages due to a

---

[52] *See Bogle*, 332 F.3d at 1355. "[T]here is no doubt that [during 2002 and 2003, the operative time frame of Plaintiff's claims,] it was clearly established that intentional discrimination in the workplace on account of race violated federal law." *Bogle*, 332 F.3d at 1355 (citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1321 (11th Cir.2000)).

delay in his approval for outside employment under the analysis of *Foy v. Holston*, 94 F.3d 1528 (11th Cir.1996), and its progeny. In *Foy*, the Eleventh Circuit held that, "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." *Foy*, 94 F.3d at 1533. The Eleventh Circuit further clarified in *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280 (11th Cir.2000), that a "defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations." *Stanley*, 219 F.3d at 1296; *Bogle*, 332 F.3d at 1356; *see also Johnson v. City of Ft. Lauderdale, Fla.*, 126 F.3d 1372, 1379 (11th Cir.1997). Thus, even assuming that a defendant official acted with some discriminatory motive, such does not "clearly establish that a reasonable official faced with the same evidence of [plaintiff's misconduct]" would not have acted in the same manner. *Johnson*, 126 F.3d at 1379; *see Stanley*, 219 F.3d at1297("Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable police chief - faced with the same undisputed evidence of [plaintiff's] misconduct - should not have terminated [plaintiff] in the same manner.").

In applying the *Foy* analysis to this case, it is important to note that Plaintiff has not presented any specific argument in opposition to Defendant's qualified immunity contention and he has wholly failed to offer any opposition to Defendant's arguments based upon *Foy* and its progeny.[53] Under similar circumstances, the Eleventh Circuit found the following:

---

[53] Indeed, Plaintiff's entire argument in opposition to summary judgment appears to focus solely on Alabama law regarding discretionary function immunity.

> [Plaintiff] points us to no cases (and we have found none) which
> would have clearly established as a matter of law that a reasonable
> police chief [and major and mayor] cannot act unlawfully under these
> circumstances - even when we accept that the circumstances do
> include a retaliatory motive on account of [the] protected speech . . .
> because given the circumstances and the state of the law, a reasonable
> police chief could have terminated [plaintiff] for his misconduct and
> thus could have considered [plaintiff's] termination proper, even if
> motivated in a substantial part by an unlawful motive. . . .
> [T]ermination of [plaintiff] was objectively reasonable for the
> purposes of qualified immunity.

*Stanley*, 219 F.3d at 1297.

In this case, the court finds that Busken, Weaver and Wells are entitled to a similar grant of immunity as was given in *Stanley*. As noted above, after setting aside those equal protection claims that are not adverse employment actions, the only remaining cognizable claims are demotion, delayed pay raise due to negative comments on a performance evaluation, removal from the SRT/ SWAT team, not being allowed to carry a firearm on light duty, and lost wages due to a delay in his approval for outside employment. As to at least three of the alleged adverse employment actions – demotion, Busken's negative comments on a performance evaluation, and removal from the SRT/ SWAT team – Edwards' involvement with a pornographic website was the catalyst that led to those decisions. Even assuming that a reasonable jury could find that Busken and Weaver acted with discriminatory motive in making those decisions, Plaintiff has presented no case law that establishes that "a reasonable police chief [or Major] - faced with the same undisputed evidence of [plaintiff's involvement with an adult website] - should not have [taken those actions] in the same manner." *Stanley*, 219 F.3d at 1297. Indeed, there is no case law to establish that it was unlawful to demote Edwards to the position of officer after he admitted to designing an adult website and the STAC team

commander said he would not recommend Edwards to serve on his team.[54]   Nor is there any case law to establish that Busken and Weaver should not have removed Edwards from the SRT/SWAT team based on their belief that he had bad judgment, and there is no case law to establish that Busken should not have commented on Plaintiff's judgment on his performance review.

Likewise, as to the allegations that Weaver imposed light duty restrictions on Edwards and that Busken required Edwards to fill out an employment agreement before beginning outside work, there is simply no case law to establish that those actions were unreasonable given the circumstances as outlined in Section III.A.2.d. and III.A.2.e. *supra*.   Therefore, *Foy* applies and, in the absence of any fair and clear warning that Defendants should not have taken the actions of which Plaintiff complains, qualified immunity is appropriate.

Thus, under the analysis of *Foy*, and given the lack of any intelligible opposition to Defendant's qualified immunity argument, the court finds that summary judgment on Plaintiff's §1983 claims is also due to be granted because Defendants are due qualified immunity.

## IV.   Conclusion

For the reasons stated above, Defendants' motion for summary judgment is due to be granted as it relates to the Plaintiff's claims under Section 1983 and Title VII. The court finds that no genuine issues of material fact remain for trial as to those claims and that Defendants are entitled to judgment as a matter of law. As to the remaining state law claims, the court declines to exercise

---

[54] Unlike *Bogle*, where the Eleventh Circuit found that qualified immunity was not applicable "given the [Plaintiffs'] evidence suggesting the reorganization plan was a sham designed to cover up the race-based transfers [which gave] a reasonable jury [] reason to doubt [Defendants'] asserted nondiscriminatory reason for the transfers, 332 F.3d at 1356, Plaintiff in this case *admits* that he committed the act that precipitated his demotion.

60

supplemental jurisdiction under 28 U.S.C. § 1367(c)(3); accordingly, those claims are due to be remanded to the court from whence they came. A separate order will be entered.

**DONE** and **ORDERED** this ___8th___ day of July, 2005.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE